Thank you, Your Honor. Mark Bove, appearing for the appellant, Joel Herrera. Mr. Herrera has brought this appeal, Your Honors, because the District Court, in adjudicating the summary judgment motion filed by United Airlines, was overly restrictive in setting the criteria for similarly situated comparators. This comparative evidence, in turn, was critical to Mr. Herrera's proof of pretext sufficient to survive the summary judgment under the Kendrick case and its progeny. There is a secondary issue in the appeal about whether three pieces of evidence dealing with the factual circumstances of three of the comparators were not properly considered by the District Court in the summary judgment process. Was any of that evidence that you argue was not considered, was any of that included in the appendix? No, I don't believe it is in the appendix. How can we consider it? Let's say we agree with you. How can we consider your appeal point if we don't have, if our record is confined to your appendix and those documents aren't in it? Well, I think the District Court properly described exactly what the documents were and explained. I was about to say that I think the secondary issue may turn out to be immaterial because, in our view, certainly if these comparators are accepted, the additional information that's added by those three pieces of evidence is cumulative, really. All it did was confirm. Are you withdrawing that issue? No, I'd rather not withdraw it because I do think it's in the record in terms of the District Court's decision. But, as I say, largely those three pieces of evidence confirmed what we had already known and asserted about these comparators. The real issue that I think is dispositive of the case is, are these people proper comparators or not? And on that issue, what we have here are four white non-Hispanic employees and one other Hispanic employee who worked side-by-side, shoulder-to-shoulder with Mr. Herrera, day in and day out, year after year. They all held the same job title. They were all aircraft mechanics. They all worked on the same aircraft. They dealt with the same mechanical issues every day at work. They reported to the same manager. They worked at the same airport, DIA. In many cases, they worked on exactly the same shift. In some cases, different shifts. But all of the comparators worked under the management of Mario Terenzio, who is the Director of Maintenance for United at Denver International Airport. They all worked under the same guidelines, the United's Working Together Guidelines, which is an employee handbook type of compilation of procedures. They all worked under the same collective bargaining agreement between the Teamsters Local 455 and United Airlines. They were all subject to the same attendance regulations. They were all subject to the same city and county of Denver regulations governing the airport. They were all subject to the same FAA regulations governing aircraft. All of the comparators, including the four non-Hispanic gentlemen and the other Hispanic employee, incurred misdemeanor offenses which occurred outside of work but required some accommodation by United due to the sentences and repercussions from the offenses. And is that where it sort of falls apart when you talk about some accommodation? Do we have to have, as a comparator here, the same accommodation? Well, certainly that is our position is that the degree of the accommodation or the comparable seriousness criteria that's in the case law allows us to compare things that are not identical. And I think that's the lesson of not only Aramburu but all the cases that follow. As you say- So we don't have anyone in your comparator group who had to wear an ankle bracelet? Well, we do. We actually have two that have ankle bracelets. We have two that had custodial jail sentences and one that had home detention instead of work-release detention. Was there any evidence in the record that any of the comparators that you put forth had restrictions that would keep them from coming to work as needed or having restrictions from being able to work on time or working less or having to leave early, that type of thing? No, not with regard to Mr. Herrera and not with regard to Mr. Coffey, who was the home detention gentleman, and not with regard to Mr. Lieber, who was the ankle bracelet gentleman. Or Mr. Mock. Or Mr. Mock, I'm sorry. Yeah, Mr. Mock had the ankle bracelet, yes. But the two that were in jail were Mr. Avila and Mr. Schneider. Now, those aren't really a fair comparison, though, are they? Because at least one of them had basically enough vacation time to cover his whole sentence. That's right. Well, not enough. He had enough to cover most of it. He missed four days. Missed four days. Right. And, you know, got a demerit for those four days, United points out to us, but he's still employed, is our point. Well, there was no accommodation for him, really. I mean, he got in trouble. He served his time and used his vacation time to serve his time in jail. And as far as United was concerned, they knew nothing about it. So it wasn't that they treated him one way or the other. They didn't treat him at all. Well, I think certainly they had to grant him the use of his vacation time and the extra four days. Did they even know he was in jail at the time he was allegedly on vacation? Yes, I believe they did. They knew that? And you presented that evidence? Well, no, I mean, we know that there was evidence about the time records of Mr. Schneider. But there's no evidence that United knew that he was in jail. Oh, I believe they did know he was in jail. In other words, I believe he requested the vacation time, as did Mr. Herrera as well. He requested vacation time for part of the vacation time. He said, I want this vacation time because I'm in jail? Yes. Okay. And you have that in the summary judgment record you presented evidence of? Well, again, it's not in the appendix, but it was before. Okay. Even in district court, you submitted evidence that he said, I want vacation time because I'm in jail? Yes. Mr. Herrera, you mean, or Mr. Schneider? Mr. Schneider. I think I can't picture in my mind the exact time records, but I think it was well known that he was in jail. Okay. And that's why the extra four days, you know, in other words. And that was an accommodation by United. I mean, they didn't have to give him the extra four days. But they did have to give him the 71 days. Well, he had vacation time. I mean, it's discretionary with them, I think, whether they allow him to apply his vacation time. Yeah. Let me ask it this way. You haven't argued to us in either of your briefs that there was something discretionary with United that they could have withheld permission to use vacation time for Schneider? No. Well, I think they could have, yes. Well, I'm not asking you what you think today. I'm just saying on the papers that you presented to us, I didn't see that. Yeah. But I think certainly the use of the leave without pay or the extra four days was completely discretionary with United. Okay. So those were the different types. We've just covered them. United had to make some accommodation, either the vacation time, the leave without pay, the wearing of the ankle bracelet. The question is, are these of comparable seriousness? Well, why is that the question? You know, in other words, if they said, Mr. Herrera, you're a criminal, we're going to let you go, that's a bad thing. And then I can see why we're talking about the seriousness of these crimes that are committed by Mr. Mock and Schneider and the like. But that's not what United did. They didn't say that. What they said is, you can't come to work because you're going to be in jail for 60 days. And for three of the comparators, two with ankle bracelets, if you have an ankle bracelet, maybe there's reasons that United may or may not want them wearing an ankle bracelet, but they were able to come to work, right? Right. Okay. And so there was nothing comparable about the inability to come to work for Mr. Herrera versus Mr. Mock and Mr. Lieber, because they could come to work, they just had to wear an ankle bracelet. Well, actually, with regard to Mr. Mock, I should say Mr. Herrera had no restriction at all on coming to work. He was scheduled to work the same schedule, the same days, the same hours, at the same location, and he was granted the work release to do that. That's undisputed. Now, would the work release program have required additional administrative burden on United? It would have required some kind of basically a sign-off to say we understand that he's on work release, and I believe there was a meeting that the district court talks about on September 1st with Mr. Terenzio, Mr. Herrera, and some of the union people, and that was largely the discussion about what do we have to sign off on and how will this work. Right. Was there any discussion of whether United would have to allow the probation officer or some other state authorities to come on their premises to check on him? It never got to that point, no. Would that have been something they would have had to allow? I think there was something in the work release guidelines that indicated that the sheriff's office had the right to do that if they needed to, but, of course, there are also regulations at the airport about who can have access to the property, so all of that would have had to have been worked out. So a minor administrative burden, yes. And let me ask you another question. So is there any evidence in the record, in your appendix, that would show that any of the comparators placed a similar burden on United by their requests? Well, I mean, because my memory is that some of these people that were on home detention or had an ankle bracelet, that they may not even have told United that they had it, that they just had it and they just showed up to work like nothing was wrong. They never went around telling people. Right. That did not become entirely clear even through the interviews. I think these employees were reluctant to say, you know, exactly what they had done back at the time. But clearly the gentleman who were in jail, as I said earlier, did have to report that. It was evident that one of the persons was wearing an ankle bracelet. And obviously the reason we found out about all these people is because somebody saw them wearing an ankle bracelet at some point. So, you know, well, let me do this. It's pausing the questions. I'm going to reserve the rest of my time if I might. Thank you. Good morning, Your Honors. May it please the Court, William T. O'Connell for Defendant, United Airlines. The dispositive issue in this case is not whether certain non-Hispanic United technicians were allowed to continue their employment after being convicted of some sort of misdemeanor offense. Rather, it's whether United discriminated against Mr. Herrera on account of his national origin by not allowing him to continue his employment via work release. In this appeal, and actually in front of Judge Ebell, plaintiff attempted to convert this case to one premise on whether United allowed non-Hispanic technicians to continue their employment after being convicted of some sort of misdemeanor offense. This Court should flatly reject that attempt to change the theory of the case. Plaintiff had the responsibility of specifically identifying the conduct challenged in his complaint in order to put United on notice of what the issue was. And plaintiff's new theory directly contradicts the multiple references in his complaint to work release and specifically the allegation at paragraph 11 of his complaint that, quote, United allowed at least three similarly situated white, non-Hispanic co-workers of Mr. Herrera to participate in work release programs and continue their employment, including Byron Coffey, James Schneider, and Marty Mock. The District Court properly identified the dispositive issue in this case and based its findings on Mr. Herrera's failure to offer even a single instance where United supported a non-Hispanic employee's work release request. The District Court thoroughly analyzed the purported comparators, specifically Mr. Mock, Mr. Schneider, Mr. Lieber, and Mr. Coffey, and found that none was a viable comparator. With respect to Mr. Mock, as the panel appears to already be aware, he was never sentenced to jail. He accepted a plea deal in May of 2014 and was sentenced to wear an ankle bracelet for 10 days, during which time he continued to work at United Airlines. So as far as Mr. Mock goes, the circumstances aren't even close to Mr. Herrera. Was there evidence that United knew that he was wearing the ankle bracelet? Your Honor, I don't know if there was any evidence one way or the other. Because that would be relevant. If you would make that allowance for him, I guess the parallel argument is if you make that allowance for him, you should make that allowance, some type of allowance for Mr. Herrera to permit him to continue working. Well, Mr. Herrera's circumstances are vastly different because of the 60-day mandatory minimum he was ordered to serve in Arapahoe County Jail. He was granted work release. However, Mr. Mock was never sentenced to jail. So while Mr. Herrera may have had to wear an ankle bracelet while out of the jail, Mr. Mock never had to return to jail at the end of the night. So in other words, apples and oranges. Mr. Snyder, as the panel is already aware, was sentenced to jail time. However, he had vacation time to cover all but four days. So again, nothing related to work release relevant to Mr. Snyder. And as the panel is clearly aware, he was disciplined by United for the four days that he didn't have to cover his remaining jail time. Well, part of the reason for the termination of Mr. Herrera, as I understood it, was that he had violated the company's good conduct requirements by violating the law. Now, these other gentlemen had done the same thing. Nothing was held against them for that. They continued to work for United even after their convictions. That's correct, Your Honor. And Mr. Herrera was applauded for voluntarily informing his supervisors of his arrest. So United never believed that Mr. Herrera was trying to cover anything up. However, it all goes back to the work release request of Mr. Herrera's. And the work release request and the restrictions inherent in a work release program are vastly different than a technician who has to wear an ankle bracelet or even Mr. Snyder who was ordered to serve home detention. So, Your Honor, as far as United is concerned, it's all about the work release request and not the underlying criminal action. With respect to Mr. Lieber, he's another one like Mr. Mock who was never sentenced to jail. He was sentenced to, excuse me, he was required to wear an ankle bracelet during which time he continued to work at United. Mr. Coffey, as I just alluded to, was sentenced to 180 days of home detention. Now, United submits that home detention and work release from the Arapahoe County Jail are by their very nature different. However, even if there's some corollary between the two, as the district court referenced in its order granting United's motion for summary judgment, there was no evidence submitted by Mr. Herrera that Mr. Coffey was non-Hispanic. There was no evidence submitted that the home detention corresponded with Mr. Coffey's employment at United. And with respect to a question asked of Mr. Bove, there was no evidence submitted by Mr. Herrera that United even knew that Mr. Schneider was sentenced to home detention. So for those reasons, Mr. Schneider? I thought you were talking about Mr. Coffey. Mr. Coffey, I'm sorry. Mr. Coffey. So to the extent we have these four gentlemen, we have two ankle bracelet wearers only with no jail time involved. We have Mr. Schneider, who was not a work release participant. And we have Mr. Coffey, who I just alluded to, Your Honor, who was on home detention. However, as I indicated, no evidence that United even knew of it. With respect to Mr. Avila, who was the other employee within the custodial group, along with Mr. Schneider, the district court correctly determined that Mr. Avila was not a viable comparator because he was jailed without work release. So work release wasn't even an option for Mr. Avila. Touching quickly on William Bragg, who was the United technician out at San Francisco International Airport, the district court correctly found that it wouldn't consider Mr. Bragg as a potential comparator because there was no evidence submitted by Mr. Herrera identifying Mr. Bragg's race, whether this alternative sentencing agreement that Mr. Bragg was subject to was a comparable work release program, and finally, whether Mr. Bragg's supervisors ever requested guidance from the company with respect to his alternative sentencing agreement. United based its decision that it wouldn't support Mr. Herrera's work release request on his inability to freely perform his job responsibilities without the restrictions inherent in a work release program, as Judge Carson touched on earlier, the risk that Mr. Herrera would not be able to predictably attend work during his incarceration and while on work release. The fact that if work release was approved for Mr. Herrera, it would need to be considered and potentially approved for all of United's 85,000 employees. And finally, the fact that Linda Ross, whose name is mentioned throughout the record, Ms. Ross's research didn't reveal any United employee who had been provided work release, and that research of Ms. Ross's was thorough. That research involved canvassing colleagues within the technical operations unit of United Airlines, speaking to senior managers, managing directors, HR directors, as well as canvassing United employees within the labor relations departments and legal departments. Isn't your real problem here that the district court narrowly defined the definition of a similarly situated employee and basically took away the plaintiff's ability to find some comparators? I don't believe so, Your Honor, because plaintiff teed this case up as one premised on work release. And when discovery revealed that there were no other United employees, non-Hispanic employees, who had requested work release, let alone been granted work release, the theory shifted to one based on the misdemeanor sentences that I alluded to earlier. Was there an amended complaint in this case? There was not, Your Honor. So from the get-go, the case has been about work release. Judge Ebell thoroughly analyzed the comparators that Mr. Herrera put forward, most of which are named in his complaint, and found that none were viable comparators because none had applied for or been granted work release from their custodial jail sentences. So unless the panel has any other questions, I will waive the balance of my time by ending that Judge Ebell thoroughly analyzed the evidence and found that Mr. Herrera had not come forward with any evidence to show that United's legitimate, non-discriminatory reasons for denying his work release request were pretextual. Were there two adverse actions here? One was the denial of the work release request and the other termination? I believe, Your Honor, they could be looked upon in that way, but they're one and the same. Without work release, he couldn't report to work for 60 days. He only had enough vacation time, unlike Mr. Schneider, to cover 14 of those days. So because of that, there was no other decision. So we should look at termination as the adverse action? Correct. Part and parcel with the fact that he had to be terminated if the work release request wasn't granted. Thank you. Let me point out, in response to several questions, that there was not an amended complaint, Judge Carson, but there was a pretrial order entered, which is in the appendix, and it starts at page 16, and it goes through both of these issues that Mr. O'Connell raised. That is, it clearly indicates that the scope of the case involves the comparison of the treatment of the misdemeanor convictions of all the employees that we mentioned, Mr. Mock, Mr. Schneider, Mr. Coffey, Mr. Avila, and Mr. Lieber. They're all mentioned by name in the pretrial order. Also, their race is identified, because that's been an issue off and on. Well, in the final pretrial order? Yes. I mean, well, the federal pretrial order and your allegations in the federal pretrial order are not evidence. They could be considered in summary judgment. Well, yeah, but the pretrial order provides that it controls the scope of the case. But did they stipulate to the rate, to the nationality of these comparators? Well, there wasn't a stipulation in there, but if you look at United's section of defenses in the pretrial order, it has a general denial of discriminating against Mr. Herrera, et cetera, but nowhere does it say Mr. Lieber is not a white male or anything to that effect. In fact, if you look at United's briefs to this court, they repeatedly refer to the four non-Hispanic mechanics, because that's what they are. Their race was never disputed. They're four white males. Mr. Avila's race is described in the pretrial order, and it's described in United's brief as being Hispanic and so forth. So none of that is disputed. The other thing I would mention just about Mr. Bragg, since he hasn't gotten much time, is that he's not under the Aramburu umbrella, if you will, because he didn't work at DIA. However, the fact that we were able to locate a work release agreement, which is virtually identical to the same work release type program that Mr. Herrera had, without any access, inside access, to United Records, kind of belies the position of United that this issue had never existed in the past. Thank you. Can I ask a question? Go ahead, sure. Did you have a discovery request for documents showing whether other employees who had work release were allowed to continue to work? Yes. Okay. And were any documents produced in response to that request? Well, as I say, no. I mean, Ms. Ross, in fact, we took Ms. Ross's deposition, and she went through the effort she had made contacting people to try to locate. But we're talking about 85,000 employees here. Right. And the fact that none of them had ever been on work release in the past is kind of incredible. Yeah. Well, and you did find somebody. We did find somebody. Okay. All right. Thanks. Thank you. Thank you. Thank you both for your arguments. The case is submitted.